HAMILTON BANK, N.A., Plaintiff,

v.

KOOKMIN BANK, et ano., Defendants.

No. 98 CIV. 2162(LAK).

United States District Court,
S.D. New York.

April 28, 1999.

Kevin C. Logue, William C. Rand, Paul, Hastings, Janofsky & Walker LLP, New York City, for Plaintiff.

Elliot Silverman, McDermott, Will & Emery, New York City, for Defendants.

## MEMORANDUM OPINION
### (Second Corrected)

KAPLAN, District Judge.

Kookmin Bank ("Kookmin"), which is organized in the Republic of Korea ("Korea"),[1] presented a draft for payment under a letter of credit (the "L/C") issued by Hamilton Bank, N.A. ("Hamilton"), a national bank with its principal office in Florida.[2] Hamilton refused to pay because a required document was missing. Hamilton, however, failed to notify Kookmin by telecommunication of the reason for its refusal as required by the Uniform Customs and Practice for Documentary Credits (1993 Revision), ICC Pub. No. 500 (the "UCP"), which governed the L/C. Hamilton brought this action for a declaratory judgment and for damages for libel by a letter Kookmin sent to the Office of the Comptroller of the Currency ("OCC"). Kookmin has counterclaimed to recover the $1.5 million allegedly due on the L/C and now seeks summary judgment.

### Facts

*The Letter of Credit*

The material facts are not in dispute. On June 11, 1996, Hamilton issued a letter of credit in the amount of $1,500,000 on behalf of Sky Industries Corporation ("Sky") for the benefit of Sung–Jin Trading Co. ("Sung–Jin") in connection with a proposed transaction in which Sky would purchase leather sport shoes from Sung–Jin.[3] By the original terms of the L/C, payment would be made on a draft upon presentation of (1) a bill of lading, (2) a commercial invoice, (3) a packing list, and (4) a "copy of authaenticated [sic] telex from issuing bank to advising bank, indicating quantity to be shipped, destination, and nominating transporting company" (the "Authenticated Telex").[4] The purpose of the Authenticated Telex was to protect Hamilton. No draft would be honored until Sky first deposited and pledged funds backing the total amount of the L/C.[5]

The L/C was amended three times,[6] the only relevant amendment being the third which stated in pertinent part "on additional conditions add: No further Amendments of this L/C will be issued by applicant. Any other condition should be in accordance with 'Option Contract' signed by applicant and beneficiary dated May 31, 1996. All other terms remain un-

---

1. Pre–Trial Order Stipulated Facts ("PTO") ¶ 2.

2. *Id.* ¶ 1.

3. *Id.* ¶ 7.

4. *Id.* ¶ 11.

5. *See* Silverman Decl. Ex. 8.

6. The amendments occurred on June 14, 19 and 27. PTO ¶ 12.

changed."[7] The L/C and each of its amendments stated it was governed by the UCP.[8]

*Sung–Jin Trading's Negotiation of the L/C*

J.G. Kim, the president of Sung–Jin, attempted to negotiate a draft drawn on the unamended L/C to Kookmin's Pusan branch in June 1996. Taek Su Jun, a Kookmin manager, refused to negotiate the draft because the Authenticated Telex was not included among the documents presented.[9] According to Jun, Kim told him that "it [was] in the process of being taken care of."[10]

On July 12, Kim allegedly attempted to negotiate a draft drawn on the amended L/C at Pusan Bank.[11] That same day, Pusan Bank sent a message to Hamilton through SWIFT[12] seeking approval to negotiate the draft without the Authenticated Telex.[13] On July 17, Hamilton responded via SWIFT notifying Pusan Bank that it was not permitted to do so.[14]

On July 13, prior to obtaining a response from Pusan Bank, Kim attempted once again to negotiate his draft to Kookmin.[15] This time, in response to Jun's request for the Authenticated Telex, Kim presented to Kookmin two documents: one entitled "special instructions," purportedly from Sky Industries to Sung–Jin, dated July 2, 1996,[16] and the other a copy of an option contract dated May 31, 1996 between Sung–Jin and Sky Industries[17] which contained a reference to the special instructions.[18]

Although the option contract presented to Kookmin referred to the Authenticated Telex requirement,[19] according to Jun, Kim explained that the combination of the option contract and the special instructions obviated the need for it.[20] Kookmin did not verify this with Hamilton.[21] Nor did it inquire of Dong Nam Bank, Hamilton's advising bank in Korea, whether the Authenticated Telex had been received or into the significance of the special instructions.[22] Evidently assuming that the L/C requirements had been satisfied, Kookmin negotiated the draft and remitted $1.5 million to Sung–Jin.[23]

*Kookmin's Presentation of the Documents to Hamilton*

Kookmin sent to Hamilton the documents it obtained from Kim along with a request for payment of $1.5 million. Hamilton received the documents on July 22, 1996[24] and returned them to Kookmin via courier on July 24 with an accompanying

---

**7.** *Id.* ¶ 13.

**8.** Rand Decl. Exs. 1–4.

**9.** *Id.* Ex. 5 (Jun Dep.) at 54.

**10.** *Id.* at 55, 66.

**11.** Def. Mem. 4.

**12.** SWIFT is a secured means of communication among financial institutions used primarily to confirm financial transactions. SWIFT stands for Society for Worldwide Interbank Financial Telecommunications.

**13.** Rand Aff. Ex. 12.

**14.** *Id.* Ex. 14.

**15.** PTO ¶ 14.

**16.** *See* Rand Decl. Ex. 17. The special instructions document appears to have been signed by Moises Cikurel, on behalf of Sky Industries and notarized by Rodolfo Garcia who ostensibly is a New York notary.

**17.** *See Id.* Ex. 15. The option contract appears to have been signed by Kim and Moises Cikurel.

**18.** PTO ¶ 16.

**19.** *See* Rand Decl. Ex. 15 ¶ 4.

**20.** Jun Dep. 68–70.

**21.** *Id.* at 92.

**22.** *Id.* at 50, 56, 69, 92.

**23.** Silverman Decl. Ex. 18 (in Korean); Jun Dep. 131–33 (apparently translating Ex. 18).

**24.** PTO ¶ 23.

letter stating that they were being returned because presentment was "not in compliance with the terms and conditions of the credit."[25] On August 2, Kookmin again presented the documents to Hamilton.[26] Four days later, Hamilton again returned the documents to Kookmin[27] and sent a message through SWIFT the same day stating that Hamilton was returning them because Kookmin had not presented the Authenticated Telex as required by the L/C.[28]

### Kookmin's Letter to the OCC

Over the course of the next year, Kookmin and Hamilton exchanged correspondence regarding the L/C with no amicable resolution. On October 14, 1997, Kookmin sent a letter by facsimile to the Office of the Comptroller of the Currency ("OCC") in both Florida and Georgia.[29] Kookmin there stated that it believed that Hamilton issued the L/C with the intent not to honor it; that it had evidence that similar L/C's had been issued previously; that it .believed that Hamilton had committed fraud; and that Kookmin was preparing a lawsuit in Korea. Kookmin asked, moreover, for certain factual information about Hamilton.[30] In response to this letter, the OCC requested information from Kookmin regarding its evidence of the alleged fraud.[31] Kookmin provided details pertaining to Hamilton's failure to make payment on the L/C and of its issuance of at least one other letter of credit with an authenticated telex requirement.[32] The OCC sent Hamilton a copy of Kookmin's initial letter and inquired about the allegations it contained.[33]

### Procedural History and Claims Asserted

Kookmin brought an action in Korea on or about December 5, 1997 to recover damages for Hamilton's refusal to honor the L/C. Hamilton subsequently brought this action seeking an injunction barring prosecution of Kookmin's Korean action, a declaratory judgment and damages for libel against Kookmin. It also sued Sky Industries, claiming that Sky must indemnify it if Hamilton is found liable to Kookmin. Kookmin counterclaimed against Hamilton for Hamilton's dishonoring the L/C. This Court denied Hamilton's motion to enjoin the Korea suit,[34] which since has been decided in Kookmin's favor. Kookmin moves now for summary judgment dismissing the complaint. It argues that (1) Hamilton's failure to follow precisely the procedures of the UCP precludes Hamilton from relying on the lack of the Authenticated Telex to justify dishonoring Kookmin's draft drawn on the L/C; (2) Hamilton is estopped from claiming that Kookmin failed to obtain the Authenticated Telex because Hamilton itself was responsible for its issuance;[35] and (3) Hamilton has no claim for libel.

### Discussion

### Choice of Law

A threshold issue concerns the law that governs resolution of this dispute.

---

25. *Id.* ¶ 24.

26. *Id.* ¶ 26.

27. *Id.* ¶ 27.

28. *Id.* ¶ 28.

29. *Id.* ¶ 31.

30. *See* Rand Decl. Ex. 25.

31. PTO ¶ 32.

32. *Id.* ¶ 33.

33. *See* Silverman Decl. Ex. 29.

34. *Hamilton Bank, N.A. v. Kookmin Bank,* 999 F.Supp. 586 (S.D.N.Y.1998).

35. Kookmin's argument, in essence, is that the beneficiary of a condition precedent cannot take advantage of the failure of the condition when the failure is due to the beneficiary's actions. But reliance on this line of reasoning is misplaced. Hamilton had no obligation to issue the Authenticated Telex, as does the beneficiary to effect a condition precedent. Moreover, the failure was not due to Hamilton's actions. The telex was to be issued only after Sky so requested and deposited funds with Hamilton to cover a draft drawn on the L/C. Because this claim is meritless, it warrants no further discussion.

It is well settled that when subject matter jurisdiction is based on diversity, federal courts look to the choice of law rules of the forum state.[36] Under New York conflicts principles, the law of the issuing bank's locus governs with respect to liability for the nonpayment of a draft under a letter of credit,[37] and claims for libel generally are governed by the law of the plaintiff's domicile.[38] As Hamilton is based in Florida, both claims are governed by Florida law.

*UCP Article 14*

■ It is undisputed that Kookmin never presented an Authenticated Telex and that the conditions to payment on the L/C therefore were not satisfied fully. Kookmin nevertheless claims that Hamilton is precluded under the UCP[39] from relying on this deficiency because it did not (a) notify Kookmin via telecommunication of the specific reason for its refusal to pay; and (b) state all discrepancies in respect of which the bank refused the documents.

■ UCP Article 14, "Discrepant Documents and Notice,"[40] provides that an issuing bank may refuse documents presented to it for the purpose of drawing on a

letter of credit if it "determines that the documents appear on their face not to be in compliance with the terms and conditions of the Credit."[41] If the issuing bank does so, "it must give notice to that effect by telecommunication ... no later than the close of the seventh banking day following the day of receipt of the documents."[42] Moreover, "[s]uch notice must state all discrepancies in respect of which the bank refuses the documents ..."[43] Failure to act in accordance with these provisions "preclude[s the issuing bank] from claiming that the documents are not in compliance with the terms and conditions of the Credit."[44] This preclusion, furthermore, is strict. Under Florida law, "a bank will be estopped from subsequent reliance on a ground for dishonor if it did not specify that ground in its initial dishonor."[45] The provisions of Article 14 thus "have been interpreted to incorporate a penalty against an issuing bank that does not assert the noncompliance of documents in a timely fashion."[46]

■ It is undisputed that Hamilton did not communicate its rejection via telecommunications. It replied via DHL courier.[47]

**36.** *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Lee v. Bankers Trust Co.,* 166 F.3d 540, 545 (2d Cir.1999).

**37.** N.Y. Unif. Com C. § 4–102(2) (McKinney 1991).

**38.** *See Lee v. Bankers Trust Co.,* 166 F.3d 540, 545 (2d Cir.1999) (citing *Reeves v. American Broad. Co.,* 719 F.2d 602, 605 (2d Cir.1983) ("the state of the plaintiff's domicile will usually have the most significant relationship to the case")).

**39.** As an initial matter, the UCP apply here. The L/C states on its face that it is governed by the 1993 revision. Under Florida law, the UCP control if the terms of a letter of credit incorporate them. *See, e.g., Banco do Brasil v. City Nat'l Bank,* 609 So.2d 689, 690 (Fla. App.1992), *review denied,* 617 So.2d 318 (Fla. 1993). Moreover, aside from one of Hamilton's alternative arguments discussed below, the parties agree that they apply.

**40.** *See* Def. Mem. Ex. 1.

**41.** UCP Art. 14(c), (d)(i).

**42.** *Id.*

**43.** *Id.* Art. 14(d)(ii).

**44.** *Id.* Art. 14(e).

**45.** *Kerr–McGee Chemical Corp. v. FDIC,* 872 F.2d 971, 973 (11 Cir.1989) (Powell, J., sitting by designation); *see also Banco General Runinahui, S.A. v. Citibank Int'l,* 97 F.3d 480, 486 n. 13 (11th Cir.1996); 3 James J. White & Robert S. Summers, Uniform Commercial Code § 26–9 at 167 (1995).

**46.** *Bank of Cochin, Ltd. v. Manufacturers Hanover Trust Co.,* 808 F.2d 209 (2d Cir.1986) (discussing UCP–290) (citing H. Harfield, Bank Credits & Acceptances 232 (5th ed.1974)); *accord, Marino Industries Corp. v. Chase Manhattan Bank, N.A.,* 686 F.2d 112. 118 (2d Cir.1982).

**47.** Silverman Decl. Ex. 23.

Nor did Hamilton's initial rejection of Kookmin's tender state specific reasons for its action, asserting only that the documents were "not in compliance with the terms and conditions of the Credit."[48] This was not sufficiently specific for purposes of Article 14(d), which requires, *inter alia*, that the issuing bank "must state all discrepancies" for rejecting the documents.[49]

Hamilton argues that it fulfilled the requirements of Article 14 despite these lapses. It contends first that Kookmin had notice of its rejection of the discrepant documents when Hamilton rejected Pusan Bank's attempted presentation. Even assuming, without deciding, that notice of a previous rejection is enough to meet Article 14's required statement of reasons for rejection, this claim is unsupported. First, Hamilton did not send notice to Pusan Bank of its rejection until July 17—four days after Kim negotiated his draft to Kookmin. Second, there is no allegation that Kookmin actually was aware of that rejection or that there was any privity between the two banks giving rise to constructive notice.[50]

■ Hamilton next asserts that its second rejection on August 6 via SWIFT fulfilled the Article 14 requirements. But it is mistaken. Not only was this rejection beyond the seven day limit prescribed by Article 14, but the Eleventh Circuit has held that "a bank will be estopped from subsequent reliance on a ground for dishonor if it did not specify that ground in its initial dishonor."[51] In consequence, Hamilton did not meet the requirements of Article 14.

Hamilton rejoins that the strict preclusion of Article 14 nonetheless is inapplicable because (a) the transaction was tainted by fraud; (b) Kookmin knowingly presented insufficient documents; and (c) the ICC Uniform Rules for Collections, and not the UCP, apply.

### Effect of the Alleged Fraud

■ Hamilton argues first that the special instructions and option contract were forgeries[52] and, accordingly, that it is not precluded from claiming that the documents were not in compliance with the L/C.[53] This argument, however, is misdirected.

**48.** *Id.* Ex. 22.

**49.** In fact, Article 14(d) would be rendered superfluous if Hamilton's notice of rejection were sufficient. This subsection specifies the procedures that must be followed once a determination has been made under Article 14(b) that "the documents appear on their face not to be in compliance with the terms and conditions of the Credit...." That is to say, in order even to reach the procedures of Article 14(d), a determination already has been made pursuant to Article 14(b) that the documents are not in compliance with the terms of the L/C. Thus, Article 14(d) must require something more than a mere recapitulation of what already has been determined under Article 14(b). How much more is not a matter the Court needs to decide here.

**50.** Hamilton does not even allege that Sung–Jin's presentation to Kookmin was on the same basis as its previous presentation to Pusan Bank.

**51.** *Kerr–McGee*, 872 F.2d at 973.

**52.** While the Court recognizes that there is evidence in the record supporting this claim, it is unnecessary to decide this in order to dispose of this matter.

**53.** *See, e.g., Brenntag Int'l Chemicals Inc. v. Norddeutsche Landesbank GZ,* 9 F.Supp.2d 331, 343 (S.D.N.Y.1998) (applying UCC law to the UPC). While there is no explicit fraud defense in the UCP, analogous UCC provisions may be utilized, so long as those provisions are "consistent with the UCP." *Alaska Textile Co., Inc. v. Chase Manhattan Bank, N.A.,* 982 F.2d 813, 822 (2d Cir.1992) (citing *Bank of Cochin Ltd. v. Manufacturers Hanover Trust Co.,* 612 F.Supp. 1533, 1542–1543 (S.D.N.Y.1985), *aff'd,* 808 F.2d 209 (2d Cir. 1986)). Under Florida law, an issuing bank may refuse to honor documents which are fraudulent. *See* FLA. STAT. ANN. § 675.114(2) (1998).

Assuming, *arguendo,* that Kookmin's presentment was tainted with fraud, Hamilton still faces the preclusive effect of not responding by telecommunications within seven banking days.

According to the cases Hamilton cites, Article 14(e)'s rule of strict preclusion does not apply where fraud on the issuing bank prevents it from giving sufficient notice of dishonor. The principle prevents the issuing bank from being whipsawed—sanctioned for not uncovering latent defects in documents presented while trying to comply with the prompt notification requirements of Article 14(d).[54] This rationale, however, does not advance plaintiff's case because the alleged fraud concerning the special instructions and the option contract had nothing to do with Hamilton's failure to give timely and sufficient notice of the reason for its refusal to honor Kookmin's draft. That is, Hamilton does not allege that it was gulled into believing that the instructions and option were genuine, only to discover later they were not. To the contrary, the relevant defect in the documents presented was patent, and Hamilton was acutely aware of it. The authenticity of the allegedly fraudulent documents had no bearing on Hamilton's actions. In consequence, the alleged fraud to which Hamilton refers is immaterial.

Also unavailing is Hamilton's claim that its dishonor of Kookmin's draft was justified because the transaction was fraudulent. Fraud "authorizes dishonor only where 'a drawdown would amount to an outright fraudulent practice by the beneficiary.'"[55] The fraud must infect the underlying contract.[56] Here, the fraud alleged has nothing to do with the contract—there is no allegation that the items

shipped were so completely and obviously defective as to render worthless any claim of performance.[57] Rather, the alleged fraud went to the authenticity of certain of the documents presented by Sung–Jin. The Circuit, however, has noted specifically that presentation of fraudulent documents under the letter of credit does not amount to fraud in the transaction and thus does not authorize dishonor.[58] Accordingly, Hamilton's claim of fraud has no bearing on the application of Article 14.

*Alleged Presentation of Discrepant Documents*

Hamilton claims next that Kookmin is not entitled to the benefits of the UCP preclusion rule because it knowingly presenting discrepant documents under the L/C.[59] It contends that UCP Article 13(a)—which states that "[b]anks must examine all documents stipulated in the Credit with reasonable care, to ascertain whether or not they appear, on their face, to be in compliance with the terms and conditions of the Credit"—imposed an obligation on Kookmin to present only documents that appeared on their face to be in compliance with the L/C. By failing to do so, Hamilton alleges, Kookmin did not negotiate properly Sung–Jin's draft and therefore is not protected by Article 14.

Hamilton relies on the decision of a divided Fifth Circuit panel, *Philadelphia Gear Corp. v. Central Bank*,[60] and *Brenntag Int'l Chemicals Inc. v. Norddeutsche Landesbank GZ* for this proposition.[61] In *Brenntag*, Judge Sweet held that docu-

**54.** *See, e.g., Boston Hides & Furs, Ltd. v. Sumitomo Bank, Ltd.*, 870 F.Supp. 1153, 1162–63 (D.Mass.1994). *See also E & H Partners v. Broadway Nat'l Bank*, No. 96 Civ. 7098(RLC), 1998 WL 734356, *10 (S.D.N.Y. Oct.20, 1998) ("Fraud is a well-established exception to the rule that an issuing bank must pay when a beneficiary submits documents that conform on their face to the terms and conditions of the letter of credit.")

**55.** *3Com Corp. v. Banco do Brasil, S.A.*, 171 F.3d 739, 746 (2d Cir.1999) (quoting *Recon/Optical, Inc. v. Government of Israel*, 816 F.2d 854, 858 (2d Cir.1987)).

**56.** *See 3Com Corp.*, at 746.

**57.** *Id.* at 747.

**58.** *See Rockwell Int'l Systems, Inc. v. Citibank, N.A.*, 719 F.2d 583, 588–89 (2d Cir.1983).

**59.** Pl. Mem. 18.

**60.** 717 F.2d 230 (5th Cir.1983).

**61.** 9 F.Supp.2d 331 (S.D.N.Y.1998).

ments "negotiated ... [which] were false on their face ... are not valid for presentment ... for collection on the [letter of credit]." [62] Similarly, *Philadelphia Gear* held that the issuing bank's notice of rejection was not deficient—notwithstanding its lack of specificity—because the negotiating bank was aware of the defects in the draft drawn on the letter of credit.[63] Important to the court's decision was its finding that "[i]t would be a strange rule indeed under which a party could tender drafts containing defects of which it knew and yet attain recovery on the ground that it was not advised of them." [64]

While *Philadelphia Gear* and *Brenntag* support Hamilton, they are neither the only view of the issue nor controlling here. The dissent in *Philadelphia Gear*, for example, concluded that the conduct of the negotiating bank was immaterial. It focused instead exclusively on the procedure of the issuing bank's rejection of the documents presented under the letter of credit, asserting that "[n]owhere is the issuing bank excused from its obligations by the state of mind of the beneficiary." [65] This was the focus also in *Bank of Cochin, Ltd. v. Manufacturers Hanover Trust Co.*,[66] where the Second Circuit held that an issuing bank's failure to notify the negotiating bank of the specific discrepancies in the documents and to do so within the time limits prescribed by the UCP "precludes [the issuing bank] from asserting [the negotiating bank's] noncompliance with the terms of the letter of credit." [67]

As the foregoing shows, there is case law on both sides of the issue. But the Florida District Court of Appeals squarely rejected *Philadelphia Gear* in *Banco do Brasil v. City National Bank of Miami*,[68] stating that "*Bank of Cochin* and the *Philadelphia Gear* dissent represent the better reasoned and more widely accepted view." [69] This Court of course is obliged to apply the law of Florida in this diversity case. Absent compelling indications that the Florida Supreme Court would decide the issue differently—and there are none—it is bound to follow *Banco do Brasil*.[70]

Even if the Florida courts had not taken this position, this Court notes that *Philadelphia Gear* and *Brenntag* are distinguishable from this case. Here, the notice was not merely insufficiently specific, it was untimely as well—a circumstance absent in those cases. There is nothing in *Philadelphia Gear* or *Brenntag* that suggests that an untimely response would be overlooked in these circumstances. To the contrary, the majority in *Philadelphia Gear* noted that "[b]ecause it is undisputed that Philadelphia received timely notice of nonpayment ... our inquiry must focus upon the sufficiency of [the issuing bank's] notice," [71] thus implying that the result might well have changed had the notice been untimely.

Moreover, the position Hamilton advocates is untenable. Under the plain language of the UCP, Article 14 applies when

---

**62.** *Id.* at 344.

**63.** 717 F.2d 230 at 236.

**64.** *Id.* at 238.

**65.** *Id.* at 242.

**66.** 808 F.2d 209 (2d Cir.1986).

**67.** *Id.* at 210. The UCP have been amended about once every ten years. UCP–290 Art. 8(e), which was the current version in *Bank of Cochin*, is the same in all material respects to UCP–500 Art. 14(d). The significant difference is that while 8(e) states that the issuing bank must notify the negotiating bank of any discrepancies "without delay," Art. 14(d) gives the precise deadline of seven days. That difference is not material here.

**68.** 609 So.2d 689 (Fla.App.1992), *review denied*, 617 So.2d 318 (Fla.1993).

**69.** *Id.* at 691.

**70.** *See, e.g., West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237, 61 S.Ct. 179, 85 L.Ed. 139 (1940).

**71.** 717 F.2d at 236.

the documents "appear on their face not to be in compliance."[72] Thus the UCP contemplate, even expect, the tender of documents which are noncompliant on their face. Refusal of the documents is the only sanction. There is no exception to the preclusive rule of Article 14. Nor is one warranted. While the fraud exception affords an issuing bank necessary protection against latent defects, the same cannot be said where the defects are patent.[73]

Finally, the approach advanced by Hamilton would undermine the simplicity and certainty that are the hallmarks of the letter of credit.[74] Letters of credit enhance the fluidity of commerce—a goal furthered by Article 14. To inquire into the subjective element of whether the negotiating bank knew it was presenting discrepant documents each time an issuing bank fails to adhere to the Article 14 requirements would contravene the very purpose of this very exacting system. Judge Goldberg, dissenting in *Philadelphia Gear*, summed up this point as follows:

"An inherent advantage of letters of credit is that questions regarding dishonorment are easily answered—a court or potential litigant need merely look to the choreography and see if the dancers took the proper steps. This usually poses an objective question, with the answer obvious from the face of the documents and the terms of the letter of credit. The rule [Hamilton wants this

Court] to apply ... injects into the otherwise mechanical and simple inquiry that most subjective issue of the knowledge of the beneficiary."[75]

In the last analysis the question regarding the interplay of UCP Articles 13 and 14 is who should bear the risk of loss—the bank attempting to present discrepant documents or the issuing bank which fails to adhere to the prescribed notification requirements. In *Bank of Cochin*, our Circuit reasoned that

"[i]n this era of near instantaneous international communications, we can find no rationale to justify [the issuer's] delay in informing [the beneficiary] of the specific defects.... Had this information been imparted in a timely fashion, some part or all of the funds might have been recovered.... [The issuer] was at all times in the best position to learn of the fraudulent nature of [the] activities."[76]

Similarly, Hamilton here was in the best position to know that it had not waived the Authenticated Telex requirement[77] and it could have minimized the risk of loss at the least cost. It should have done so.

*Alleged Applicability of the ICC Uniform Rules of Collection*

Hamilton argues next that Kookmin presented the documents on a collection basis and that the ICC Uniform Rules of Collection therefore apply instead of the UCP. Hamilton relies on *Alaska Textile Co. v.*

---

**72.** UCP Art. 14(b).

**73.** In fact, the record indicates that Hamilton was aware fully of the discrepancies, as it contemplated waiving them. *See* Silverman Aff. Ex. 21 (Telex from Sky Industries indicating that it would not accept the L/C with discrepant documents).

**74.** *See Philadelphia Gear*, 717 F.2d at 241 (Goldberg, J., dissenting); *see also Alaska Textile Co.*, 982 F.2d at 817.

**75.** *Philadelphia Gear*, 717 F.2d at 241.

**76.** *Bank of Cochin*, 808 F.2d at 213.

**77.** Hamilton contends that *Bank of Cochin* is not applicable because the court did not address a bank's knowing presentation of discrepant documents. This argument is misplaced. The court's silence on the issue does not warrant the conclusion that it did not consider it. There is the equally likely conclusion that the court thought it irrelevant. The court made it quite clear that timeliness was the principal issue; that upon the "failure timely to notify the confirming bank of discrepancies in the documents ... the issuing bank is precluded from asserting a claim of noncompliance." 808 F.2d at 212. The beneficiary's knowledge is immaterial to the issuing bank's duties.

*Chase Manhattan Bank, N.A.*[78] for this contention, but overstates its applicability.

In *Alaska Textile,* the collecting bank [79] presented documents for payment notwithstanding its knowledge that they were not in compliance with the letter of credit. On the form collection letter, the collecting bank typed "Documents are presented on an *approval basis.*" [80] The Second Circuit reasoned that this phrase was analogous to the phrase "on a collection basis" which could, "[d]epending on the circumstances . . . indicate that the documents are being sent on a basis independent of the letter of credit, i.e., for simple collection under the Uniform Rules for Collections." [81] This was so because "[s]uch phrases are themselves ambiguous, and their meaning must be obtained from the context. . . . [If, however,] the correspondence shows that the presentation is being made under the credit" the UCP rules will apply.[82] Ultimately the court, despite the known discrepancies in the documents and the accompanying "approval basis" request, found that the submission was made under the letter of credit.

 Here, no such phrase implicating the Rules of Collection was used. Nor is there any other basis for supposing that Kookmin acted for collection.[83] Accordingly, the UCP and not the Rules of Collection apply.[84] There is therefore no reason to entertain whether Hamilton's response was proper under the latter criteria.

For the reasons discussed above, Hamilton's efforts to get out from under Article 14 are unsuccessful. In consequence, Hamilton is precluded from relying on Kookmin's failure to present an Authenticated Telex in dishonoring the L/C.

*Failure to Mitigate*

Hamilton argues that Kookmin failed to mitigate its damages and is therefore not entitled to the full amount of the L/C even if it prevails on liability. Hamilton, however, is unable to demonstrate the existence of any duty to mitigate in these circumstances.

 Although there might be a choice of law issue here, neither party contends that Korean law applies, and the end result would be the same under either New York or Florida law. Pursuant to New York law, actual damages under a letter of credit need not be proved.[85] And while Florida law reduces the award on a dishonored letter of credit by the amount for which any goods are resold, it imposes no duty to resell the goods. The reasoning of the Fifth Circuit is instructive:

"The measure of damages used in ordinary contract cases is inapplicable because a letter of credit simply is not an ordinary contract. The letter of credit is a unique device developed to meet specific needs of the marketplace. If the letter of credit is to retain its utility as a commercial instrument, the rights and duties of the issuer, the beneficiary, and the procurer must remain clear.

---

**78.** 982 F.2d 813.

**79.** A collecting bank is one acting as an agent of the beneficiary for the purposes of presenting the documents under the letter of credit and receiving payment on the draft. *See id.* at 817 n. 2.

**80.** *See id.* at 817 (emphasis supplied).

**81.** *Id.* at 818.

**82.** *Id.* (internal quotations omitted).

**83.** *See* Silverman Decl. Ex. 19 (Kookmin submission to Hamilton); *Id.* Ex. 22 (Hamilton response to Kookmin's submission).

**84.** *Alaska Textile,* 982 F.2d at 818; *Glencore, Ltd. v. Chase Manhattan Bank,* 1998 WL 101734, at *7 (S.D.N.Y.1998).

**85.** *See Hellenic Republic v. Standard Chartered Bank,* 244 A.D.2d 240, 664 N.Y.S.2d 434, 434 (1st Dept.1997), *lv. to app. denied,* 91 N.Y.2d 811, 671 N.Y.S.2d 715, 694 N.E.2d 884 (1998) ("[A] letter of credit is an instrument that must be considered separate and apart from the underlying contract. . . . [T]he trial court properly precluded defendant from introducing evidence as to plaintiff's actual damages.").

Parties to commercial transactions must be able to rely on the fact that as soon as the conditions contained in a particular letter are satisfied, payment is due." [86]

Although Hamilton cites *Hyosung America, Inc. v. Sumagh Textile Co. Ltd.*,[87] and *Wichita Eagle and Beacon Publishing Co. v. Pacific National Bank of San Francisco*,[88] for its proposition, those cases are not helpful to it. *Wichita Eagle* merely stated the general rule of mitigation applicable to contracts for the sale of goods. It did not address whether a duty to mitigate arises in the letter of credit context.[89] *Hyosung* involved an action for fraud and mitigation of tort damages, not wrongful dishonor of a letter of credit.[90]

In light of Hamilton's failure to establish either that there was any duty to mitigate damages on a dishonored letter of credit, or that Kookmin actually resold any of the goods, Hamilton's mitigation of damages defense is baseless.

*Alleged Libel*

The final issue this Court must address is whether Kookmin's letter to the OCC was libelous. Kookmin claims: (1) the letter merely stated an opinion, (2) it was truthful, (3) Hamilton failed to follow the requirements of the Florida pre-suit notice statute, and (4) the statements were privileged.

■■■■■■ While a statement of pure opinion will not support an action for libel, such is not the case for a statement of mixed opinion and fact.[91] The Florida District Court of Appeals distinguished pure opinion from mixed opinion as follows:

"Pure opinion is based upon facts that the communicator sets forth in a publication, or that are otherwise known or available to the reader or the listener as a member of the public. Mixed opinion is based upon facts regarding a person or his conduct that are neither stated in the publication nor assumed to exist by a party exposed to the communication. Rather the communicator implies that a concealed or undisclosed set of defamatory facts would confirm his opinion." [92]

Kookmin's statement in its letter—"[w]e have evidence that Hamilton ... has issued similar documents with same results" [93]—referenced undisclosed facts that were not known or available to, or assumed to exist by, the OCC. The statement also was arguably defamatory. The reference to "similar documents" was to letters of credit on which Hamilton allegedly had no intention of honoring. In consequence, the statement was one of mixed opinion which is actionable for fraud.

Kookmin's claim that its statements were true fares no better. Its contention that Hamilton issued the L/C with the intent to dishonor it is highly dubious. Kookmin reaches this conclusion from the fact that "Hamilton agreed with Sky from the outset that any letters of credit issued ... would be 'inoperative' and that Hamilton would never issue the telexes neces-

---

**86.** *East Girard Savings Ass'n v. Citizens Nat'l Bank and Trust Co. of Baytown*, 593 F.2d 598, 603–04 (5th Cir.1979). *See also Bank of North Carolina v. Rock Island Bank*, 630 F.2d 1243, 1254 (7th Cir.1980) (nothing "indicates that a beneficiary of a letter of credit must mitigate its damages by trying to recover from someone other than the issuer, and such a rule would reduce the value and discourage the use of letters of credit.")

**87.** 25 F.Supp.2d 376 (S.D.N.Y.1998), *aff'd in relevant part*, 137 F.3d 75 (2d Cir.1998).

**88.** 343 F.Supp. 332 (N.D.Cal.1971), *rev'd on other grounds*, 493 F.2d 1285 (9th Cir.1974).

**89.** *Id.* at 341 (finding no duty to mitigate).

**90.** *Hyosung America*, 25 F.Supp.2d at 387.

**91.** *See Morse v. Ripken*, 707 So.2d 921, 922 (Fla.App.1998).

**92.** *Id.* (citing *Hay v. Independent Newspapers, Inc.*, 450 So.2d 293, 295 (Fla.App.1984)).

**93.** Silverman Decl. Ex. 28.

sary to make them operative." [94] This is at best a parochial reading of the L/C application and Hamilton's internal memoranda concerning its issuance. At the very least, there is a question of fact whether Hamilton had no intention of honoring the L/C.

■ Kookmin claims next that Hamilton's libel claim must be dismissed because it failed to follow the procedures prescribed by the Florida pre-suit notice statute [95] prior to filing this action. The plain text of the statute indicates that it is limited to media defendants, and the Florida courts agree.[96] The one case supporting the application of this statute to non-media defendants, *Laney v. Knight–Ridder Newspapers, Inc.*,[97] has not been followed by the Florida state courts.[98] This Court therefore follows the reasoning of the Florida courts and holds that Hamilton had no obligation to follow the requirements of the pre-suit notice statute.

■ Finally, Kookmin asserts that its letter to the OCC was privileged. To be qualifiedly privileged, the statement must have been made (1) in good faith, (2) by one who had a duty or interest in the subject matter, (3) to someone who had a corresponding duty or interest, (4) on a proper occasion, and (5) in a proper manner.[99] Application of the privilege is a question of law, so long as "there is no dispute as to the circumstances surrounding the publication." [100] There is no dis-

pute here surrounding the circumstances of publication. Kookmin published its statement to one entity, the OCC,[101] expressing its concern that it had been defrauded by Hamilton. Thus, whether privilege exists is for the Court to decide.

■ The Court holds that the single publication by Kookmin was qualifiedly privileged and the privilege was not abused in this particular instance. Kookmin's statements were made in good faith in response to Hamilton's failure to make payment on Kookmin's draft presented under the L/C. Its publication was limited in scope, and the information was not disclosed to persons other than the OCC. Furthermore, this was a statement to "a political authority regarding matters of public concern," a recognized legal ground for privilege.[102]

■ Hamilton asserts, notwithstanding, that the statement was made with express malice which obviates the privilege.[103] So long as there is sufficient evidence of the presence of express malice, a jury question is created.[104] Express malice, however, is "a very high standard for a plaintiff to meet." [105] It exists "[w]here a person speaks upon a privileged occasion, but the speaker is motivated more by a desire to harm the person defamed than by a purpose to protect the person or social interest giving rise to the privilege." [106] But there simply is no evidence of its presence here.

---

**94.** Def. Mem. 25.

**95.** FLA. STAT. ANN § 770.01 (West 1997).

**96.** *See Gifford v. Bruckner*, 565 So.2d 887 (Fla.App.1990); *Davies v. Bossert*, 449 So.2d 418 (Fla.App.1984).

**97.** 532 F.Supp. 910 (S.D.Fla.1982).

**98.** *See Davies*, 449 So.2d 418; *Tobkin v. Jarboe*, 695 So.2d 1257 (Fla.App.1997); *Bridges v. Williamson*, 449 So.2d 400 (Fla.App.1984).

**99.** *American Ideal Mgmt., Inc. v. Dale Village, Inc.*, 567 So.2d 497, 499 (Fla.App.1990).

**100.** *Shaw v. R.J. Reynolds Tobacco Co.*, 818 F.Supp. 1539, 1542 (M.D.Fla.1993), *aff'd*, 15

F.3d 1097 (11th Cir.1994); *see also Nodar v. Galbreath*, 462 So.2d 803, 810 (Fla.1984).

**101.** *See* Silverman Decl. Ex. 28. Kookmin sent the letter to the OCC's offices in both Florida and Georgia.

**102.** *Nodar*, 462 So.2d at 809.

**103.** *Id.* at 806.

**104.** *Shaw*, 818 F.Supp. at 1542.

**105.** *Id.*

**106.** *Nodar*, 462 So.2d at 811–12.

Construing the statement in the light most favorable to Hamilton, Kookmin (a) had no basis for its accusation of fraud, and (b) did not perform any reasonable investigation prior to sending the letter.[107] That notwithstanding, Kookmin attempted to work out a favorable resolution to the matter with Hamilton for over a year, Kookmin made its statements only to one entity—the chief regulating body of the banking industry, and most of its statements—including the accusation of fraud—were couched as opinion.

In these circumstances, the letter and other evidence of record cannot support an inference that Kookmin wrote it to "gratify its malevolence" or simply to harm Hamilton.[108] In addition, the words in Kookmin's letter clearly "were not so extreme as to demonstrate express malice."[109] In consequence, a jury could not reasonably find that Kookmin's statement was made with express malice. At most, the evidence would allow a finding of recklessness, but that is insufficient to support express malice.

### Conclusion

For the foregoing reasons, defendant's motion for summary judgment dismissing the complaint as against Kookmin and for summary judgment on its counterclaim is granted. The action is dismissed as to Kookmin. Kookmin shall have judgment against Hamilton for $1.5 million plus interest thereon at the rate of 9 percent from July 22, 1996 to the date of judgment.[110]

SO ORDERED.

---

107. *See* Pl. Mem. 31. The letter was written by S. SangHee Yi, a member of Kookmin's in-house counsel's office. Rand Decl. Ex. 6 ("Yi Dep.") 169. Yi had recently graduated from law school and, at the time, had two months of work experience since passing the bar examination. Yi Dep. at 7–9.

108. *Nodar,* 462 So.2d at 811.

109. *Id.* at 812.

110. *See* N.Y. CPLR §§ 5001, 5004.