McCORD, Acting Chief Judge.
This appeal is from a final judgment in a civil action for damages brought by appellant Chrysler Motors Corporation against Florida National Bank at Gainesville, hereinafter referred to as the Bank, and Recreational Enterprises Corporation, hereinafter referred to as REC. Chrysler sought damages against the Bank on account of its refusal to honor 16 drafts totaling $269,-910.57 drawn by Chrysler upon the Bank to obtain payment for 65 Dodge chassis, pursuant to letters of credit entitled “payment authorization” and “cash draft authorization” issued by the Bank. The trial court found that the Bank was required to pay only one of the 16 drafts and entered judgment only for the face amount of that one draft plus interest at 6% from November 5, 1974, totaling $28,896.06. Chrysler contends that the trial court erred in not awarding judgment on the remaining 15 drafts. We agree with Chrysler’s contention and reverse.
REC was a manufacturer of recreational vehicles. It purchased Dodge truck chassis and Dodge vans from Dodge dealers and by additions thereto converted them into recreational vehicles which it marketed. The sequence of events out of which this lawsuit arose began in 1972 when REC applied to Chrysler to establish a consignment pool of such chassis and vans. Chrysler declined to extend credit for that purpose to REC without a bank letter of credit. At that time, as a condition to the issuance of such a letter of credit to Chrysler for REC, the Bank required an assurance from Chrysler that if Chrysler exercised its rights under the letter of credit, the Bank would receive “clear statements of origin.” These “clear statements of origin” are certificates of origin (CO’s) which are the same as manufacturers statements of origin (MSO’s). The CO or MSO is the title to the vehicle. By letter dated July 27, 1972, Chrysler’s W. R. Dun-canson wrote the Bank’s then president, Clyde A. Martin, Jr., stating:
“Mr. N. C. Kinlund of Recreational Enterprises contacted us in reference to their proposed consignment agreement and the ‘Letter of Credit’ which you intend to execute for them.
“We offer the following assurance to the Florida National Bank:
“For each vehicle which Chrysler Motors Corporation collects payment from the Florida National Bank, as agreed upon in the aforementioned ‘Letter of Credit’ Chrysler Motors Corporation will forward to the Florida National Bank the applicable Certificate of Origin free and clear of all liens and/or encumbrances.”
Pursuant to Duncanson’s letter, the Bank, on August 31, 1972, issued its letter of credit in the amount of $100,000.
Shortly thereafter on September 11,1972, REC and Chrysler entered into an agreement entitled “Security Agreement — Wagons and/or Vans” and an amendment thereto which provided that Chrysler would ship chassis and vans to REC which would store them without charge to Chrysler; that title to the vehicles would remain in Chrysler while so stored; and that the vehicles would not be removed from storage nor be modified by REC until they were purchased through Dodge dealers by REC. Chrysler and REC executed and filed a financing statement (Form UCC-1) with the Secretary of State on September 21, 1972, to further protect Chrysler’s interest in the consigned inventory.
Under the agreement, when REC wished to purchase a chassis or van for conversion into a recreational vehicle, it would notify Chrysler, which would then sell the vehicle *34 to, and transfer title to a Dodge dealer, who would in turn sell it to REC. Chrysler would be paid by issuing a draft on the Dodge dealer’s bank and the Dodge dealer would, in turn, be paid by REC for the chassis or van. As a condition to entering into this agreement, Chrysler required REC to furnish it the aforementioned $100,000 irrevocable letter of credit issued by the Bank. When it became apparent that $100,000 was insufficient to meet REC’s needs, the Bank furnished Chrysler an additional letter of credit for $150,000 dated December 21, 1972. These two letters of credit were each subsequently extended by the Bank for an additional period of time ending August 31, 1974.
During the period September 1, 1972, until August 1, 1974, Chrysler was paid by Dodge dealers for all vehicles consigned to REC and never drafted on the Bank under either of the two irrevocable letters of credit.
In March of 1974, Chrysler changed its method of marketing its recreational vehicle chassis (but not its vans) by selling them direct to R. V. Manufacturers (of which REC was one) rather than going through the former consignment process under which sales were made through Dodge dealers. It continued the consignment process as to vans. To effect this change, Chrysler and REC executed a further amendment to their original agreement. The amendment provided that REC would buy Dodge chassis directly from Chrysler and build R. V. bodies thereon; Chrysler would issue invoices and MSO’s to REC for the chassis when sold and shipped to REC; Chrysler would be paid for each such chassis when REC sold it and notified Chrysler of the sale, or 90 days after the date of Chrysler’s invoice to REC, whichever date occurred first; and payment for the chassis would be effected by Chrysler drawing a draft on REC’s bank pursuant to REC’s authorization (which was Exhibit A to amendment) and pursuant to the Bank’s payment authorization (letter of credit) dated April 1, 1974, by which the Bank expressly authorized Chrysler:
“ * * * to draw cash drafts on it for payment due Chrysler for motor vehicles sold, delivered, or shipped by Chrysler to the company named below (REC), in accordance with Chrysler’s agreement or agreements with said company.”
This letter of credit further provided that the Bank could terminate it “effective immediately” by wire or telephone, with a confirming registered letter, upon the following condition:
“ * * * However, we (Bank) agree to honor and pay all drafts covering motor vehicles for which payment is then owed to you by the above named company (REC) on the date such termination notice is given by us to Chrysler; provided that the maximum amount of draft that we shall be liable to pay upon such termination, representing the percent amount that may be owed to Chrysler, shall not exceed $250,000.00 dollar amount.”
A copy of the form draft (identical to the forms used by Chrysler for the drafts which the Bank subsequently refused to pay — the subject matter of this lawsuit) was attached as an exhibit to the amendment to Chrysler’s and REC’s original agreement. This same form was used by Chrysler in drafting on all of its dealers.
Under the new direct sales procedure for recreational vehicle chassis, the invoice and the MSO would go directly to REC, and Chrysler would draft on REC’s bank, the Florida National Bank at Gainesville. Chrysler, under this procedure, would be paid by the Bank when notified by REC of REC’s sale of the chassis, or 90 days after the date of Chrysler’s invoice, whether it had been sold or not, whichever occurred first.
Although the amendment providing for direct sale to REC stated that “Dodge (Chrysler) shall issue invoices and Manufacturer’s Statements of Origin (MSO’s) therefor to the body company (REC),” Chrysler continued to send MSO’s to the Bank in accordance with Mr. Duncanson’s determination that the MSO’s “would probably best go to the bank” and his written instructions for the MSO’s to be sent to the Bank.
*35 In June, 1974, however, REC’s comptroller found it difficult to obtain MSO’s from the Bank because they were held exclusively under the control of the Bank’s then president, Clyde Martin, who was often busy and unavailable to deliver the MSO’s when REC made payment to it. As a result of this, on or about June 12, 1974, REC’s comptroller called Mr. Duncanson and asked whether arrangements could be made for REC to get the MSO’s directly from Chrysler. Duncanson advised him that such could be dome if the Bank approved, and the comptroller then requested that Dun-canson call the Bank about it. Duncanson called Clyde Martin, the Bank’s president, who agreed that the MSO’s could be sent directly to REC. Duncanson then caused instructions to be issued so that MSO’s would thereafter be mailed directly to REC.
In September, 1974, a new direct-sale-to-manufacturer agreement entitled “Sales Agreement — Special Vehicle Manufacturer” was executed by REC and Chrysler, which superseded all earlier agreements relating to the direct purchase by REC of Dodge chassis. As in the March, 1974, amendment, this new agreement provided for direct sales of chassis to REC and stated:
“DODGE will issue invoices and Manufacturers Statements of Origin (MSO’s) for Chassis purchased in MANUFACTURER’S (REC’s) name immediately following shipment thereof to MANUFACTURER. MSO’s shall only be sent direct to MANUFACTURER for deferred payment purchases upon (1) DODGE’s approval or (2) if MANUFACTURER’S bank fully and unconditionally guarantees payment for Chassis to DODGE and does not prohibit DODGE from sending said MSO’s direct to MANUFACTURER.”
Pursuant to the above-quoted provision, the Bank issued to Chrysler a letter of credit entitled “Cash Draft Authorization” dated August 30, 1974, which states:
“The bank acknowledges that Chrysler may sell, ship or deliver said vehicles to Manufacturer on a deferred payment basis, and the bank agrees that it will pay cash drafts drawn on it by Chrysler (1) when each vehicle is shipped by Manufacturer to its customer or (2) at the expiration of Chrysler’s deferred payment period or (3) as otherwise outlined in the aforementioned Sales Agreement. Each draft will show information specifying, among other things, that the vehieles(s) are sold to the Manufacturer, the invoice number, serial number, other identifying description and amount for each vehicle. The bank further acknowledges that vehicle shipments to Manufacturer will be made by Chrysler in full reliance on the bank’s commitment to pay Chrysler for vehicles so shipped. In this regard, the bank acknowledges that Chrysler will ship vehicles to Manufacturer on a revolving or continuing basis, in such quantities as shall be determined by Chrysler. Provided, however, that the bank’s commitment to pay Chrysler for said vehicles shall not exceed $300,000 at any one time.”
The deferred payment arrangement referred to in the Bank’s letter of credit is stated in the following provision of the September, 1974 agreement:
“In order to qualify for deferred payment, MANUFACTURER (REC) and its bank shall submit to DODGE (Chrysler) a bank cash draft authorization in a form acceptable to Dodge. Payment for Chassis sold on deferred payment is due and payable to DODGE on the date MANUFACTURER ships each Chassis from its production facility to its dealer, distributor or customer. MANUFACTURER shall notify DODGE’s Vehicle Releasing Department of such shipment in accordance with written instructions provided to MANUFACTURER by DODGE' for each Chassis by drawing a Cash Draft and/or Security Bill of Sale on MANUFACTURER’S bank. Provided, however, that DODGE shall automatically draw such drafts on MANUFACTURER’S bank in such manner which shall enable DODGE to effect payment for Chassis on the 90th day following the date of each Chassis invoice if MANUFACTURER has not previously reported the shipment thereof to DODGE. * * * ”
*36 The letter of credit provided that it could be terminated by the Bank or REC by giving Chrysler 24 hours notice by wire or telephone and confirmed by registered letter and further provided:
“ * * * in the event of termination of this authorization, the bank agrees to honor and pay all drafts covering vehicles for which payment may then be owed to Chrysler. * * *”
Thus, the September, 1974, agreement and letter of credit carried on the substance of the March, 1974, amendment to the original agreement and its letter of credit except that the amount of the draft authority was raised to a total of $300,000. Under the agreement, title to the chassis passed to the purchaser (REC) when the chassis was turned over to the carrier and a bill of lading issued.
In October, 1974, Chrysler issued three cash drafts totalling $78,827 for chassis bought by REC. Those drafts were accepted and paid by the Bank and were then charged by the Bank to REC’s checking account. They were on forms identical to that attached to the amendment of March, 1974, and also identical to the forms used by Chrysler for the drafts which the Bank subsequently refused to pay.
On November 13, 1974, the Bank’s new president, Kenneth Tinsley, called Chrysler’s manager of dealer credit, Frank W. Knope, and stated that the former president (Martin) had “skipped to Mexico.” Tinsley stated that he had become aware of the August 30, 1974, letter of credit issued by the Bank in favor of Chrysler for REC, and he notified Chrysler through Knope that the Bank was terminating it. By letter of November 14, 1974, the Bank confirmed the telephone conversation and formally terminated the letter of credit.
Upon receiving this notification, Chrysler immediately stopped all further shipments of chassis to REC and also attempted to stop shipment of vehicles that had already left its truck plant but were still in the hands of carriers on their way to REC. It was able to stop and recover 10 such chassis which it sold to other parties. Chrysler then continued issuing drafts upon the Bank as the deferred payment became due for each chassis shipped to REC prior to the letter of credit termination — that is, 90 days after the invoice date for each such chassis.
By letter of November 27,1974, the Bank advised Chrysler that it would not honor Chrysler’s drafts. On December 19, 1974, Chrysler’s Mr. Creed went to Jacksonville and made formal demand for payment of 75 chassis shipped to REC, but not paid for, prior to the letter of credit termination. This included the 10 chassis above referred to which Chrysler recovered but which it later, by its amended complaint, deleted from its claim, thereby reducing the claim to payment for 65 chassis. The total amount of the drafts for the 65 chassis was $269,910.57. The Bank admits that Chrysler tendered to it and demanded payment of these drafts and that it refused to pay any of them.
Immediately following his visit to Jacksonville, Chrysler’s Mr. Creed went to REC’s Gainesville place of business. He stated that the primary purpose of this trip was to check on 28 vans which had been shipped to REC on consignment. (They were not involved in the draft procedure.) He stated that he observed certain chassis which were in production and located on REC’s premises, but that he did not perform an inspection or audit or take any other action “because we (Chrysler) looked to the Bank for payment under the letter of credit and had made demand on the 19th for that.”
The pertinent conclusions of the trial court in entering judgment against Chrysler for all but one of the drafts are as follows:
“B. The Bank was not required to honor the demand for payment-under the letters of credit and payment authorizations because all of the provisions for payment were not strictly complied with by Chrysler in making such demand for payment. C. Chrysler as beneficiary of the letters of credit and the draft authorizations had a duty to mitigate its damages and to *37 minimize or eliminate its losses, and it failed to do so.
D. Chrysler placed the MSOs in the hands of REC along with possession of the vehicles and then took action only to recover ten of such vehicles. Chrysler made no attempt to recover possession and title to the remaining 65 vehicles although it had the right to do so under its agreement without legal process and the rights of a secured party under the UCC 1 Financing Statement with legal process. Chrysler is estopped to demand payment from the Bank.
E. The Bank wrongfully dishonored the draft (plaintiff’s Exhibit 19) when it returned said draft to Chrysler while funds were in REC’s account at the bank and thereafter diverted those funds to the unrelated indebtedness of REC at the Bank.”
As to the trial court’s ruling that the Bank was not required to honor the drafts because Chrysler did not strictly comply with all the provisions for payment, Chrysler contends that it did fully comply. The Bank argues that Chrysler did not comply because it did not furnish MSO’s for the chassis to the Bank. It is clear, however, that the furnishing of MSO’s to the Bank, which was a requirement of the original letter of credit, was not a requirement of the August 30, 1974, letter of credit. Further, in June, 1974, the Bank’s former president, Clyde Martin, waived the previous requirement that the MSO’s be issued to the Bank, and such requirement was never thereafter reinstated. The Bank accepted and paid all drafts issued subsequent to Martin’s waiver without MSO’s being furnished to it until it received the drafts, which are the basis of this suit, after it had cancelled the letter of credit. These were the first drafts it declined to honor. It obviously did not honor them because it did not have money from REC with which to pay them (with the one exception noted in the trial judge’s judgment). When REC’s previous drafts arrived, it had REC’s money to cover them. The Bank contends it was authorized not to pay them under its letter of credit because language contained on the bank draft required Chrysler to convey to the Bank title to any vehicle for which payment was sought from the Bank under the draft. The language referred to states:
“In consideration of the payment of this draft, Chrysler Motors Corporation does hereby grant, sell and transfer to drawee, or if drawee is the above named dealer, then to the party designated in the 'Payable At’ space hereon, the motor vehicle^) described above, and all accessories, parts and equipment affixed thereto
The record shows that the above-quoted language is printed language which appears on all of Chrysler’s draft forms including those which were paid by the Bank. The above-quoted draft language is not part of the Bank’s letter of credit, however, and as previously stated, the Bank had waived its requirement that MSO’s (title) be furnished to the Bank as a condition for payment under its letters of credit. The effect of the above-quoted language was merely to convey to the Bank, upon its payment of the draft, whatever interest Chrysler had remaining in the chassis, which Chrysler had shipped to REC and for which, with the Bank’s approval, Chrysler had sent the MSO to REC.
The Bank contends, and the trial court ruled, that Chrysler had a duty to mitigate its damages by repossessing the 65 chassis which Chrysler had delivered along with the MSO’s to REC. The September 10, 1974, agreement between Chrysler (Dodge) and REC contains the following provision:
“MANUFACTURER agrees in the event of any default in the timely paynent for Chassis contained herein, or in the event of the dishonoring or return to DODGE by MANUFACTURER or its bank of payment documents, negotiable instruments, checks or cash drafts, DODGE may, with or without legal process, retake possession of all Chassis for which payment is in default or has been dishonored, together with any Bodies and/or equipment that may be attached thereto, and DODGE may also accelerate the payment for and retake possession of any and all other Chassis, together with any *38 Body and/or equipment that may be attached thereto for which payment is then owing to DODGE, whether or not such payment is then due and payable to DODGE. DODGE may sell any or all of said repossessed Chassis, Bodies and/or equipment and apply the proceeds of said sale to any amounts owed by MANUFACTURER to DODGE. Any amount received from said sale in excess of amounts owed to DODGE shall be paid to MANUFACTURER.”
This provision for retaking possession is permissive and not mandatory, and the Bank was not a party to, nor named as a beneficiary of, such agreement. Chrysler relied upon the letter of credit given to it by the Bank rather than to attempt to retake the 65 chassis which were in the possession of REC in various stages of construction. While there was testimony that after REC completed constructing the chassis into a recreational vehicle it was more valuable than when delivered to REC by Chrysler, there was also testimony that at the time the drafts were presented for payment the bottom had dropped out of the market for recreational vehicles.
The opinion of the Supreme Court of Connecticut in New York Life Insurance Co. v. Hartford National Bank & Trust Co., 173 Conn. 492, 378 A.2d 562 (1977), illustrates the sanctity which should be attached to a letter of credit. There the Hartford Bank issued an irrevocable letter of credit to New York Life on behalf of TVC, a real estate developer. TVC borrowed construction money from Wachovia Realty Investments to construct an office complex for which New York Life made a commitment to provide a $9,000,000 permanent mortgage loan and was paid $90,000 therefor. One of the conditions of the mortgage loan commitment was that $180,000 be deposited with New York Life to satisfy a liquidated damages provision in the agreement, but in lieu of the cash deposit, New York Life agreed to accept a letter of credit issued by the Hartford Bank at TVC’s request. Under the terms of this letter of credit, the Hartford Bank promised to honor drafts drawn by New York Life on the sole condition that such drafts be accompanied by a “signed statement of the New York Life Insurance Company that the liquidated damages deposit is due to them under the provisions of this Letter of Credit.” TVC failed to meet the conditions of the mortgage loan commitment before it expired, and the loan was never made. New York Life presented the Hartford Bank with a sight draft for the $180,000, accompanied by the required statement. The Hartford Bank dishonored the draft, and New York Life brought suit. The trial court granted summary judgment- as to liability in favor of New York Life, but after hearing only awarded nominal damages. The trial court found that the subject matter of the transaction was the $9,000,000 that New York Life committed to TVC; that New York Life, upon default by TVC, had the opportunity to reinvest the $9,000,000 the return on which exceeded the face amount ($180,-000) of the letter of credit and draft; and that New York Life was, therefore, not damaged by the Hartford Bank’s wrongful dishonor of the draft. The Supreme Court of Connecticut reversed and remanded the case for a judgment for $180,000 in favor of New York Life. It found that the real issue was the damage New York Life sustained, not as a result of TVC’s default, but only as a result of the Hartford Bank’s dishonor of New York Life’s draft. The Supreme Court of Connecticut then went on to say:
“The court erred in its determination that the $9,000,000 was the ‘subject matter of the transaction’ (the letter of credit). See General Statutes § 42a-5-115. It has been said that the ‘hallmark’ of the letter of credit is that at a certain point it becomes ‘as good as cash.’ Verkuil, ‘Bank Solvency and Guaranty Letters of Credit,’ 25 Stanford L.Rev. 716, 720; Armstrong, ‘The Letter of Credit as a Lending Device in a Tight Money Market,’ 22 Bus.Law. 1105, 1109. * * * Upon TVC’s default and the proper presentation of documents, New York Life had a right to expect the letter of credit to become as good as the cash deposit which would otherwise have been available from TVC. The present litigation has thus far thwarted this expectation. The *39 $9,000,000 was the subject of the underlying transaction (the mortgage loan commitment) which, as the court correctly found, was an entirely independent contract. The performance secured to New York Life by Hartford National’s letter of credit was not the performance by TVC of its obligations under the mortgage loan commitment, but solely the payment of damages, liquidated in advance by agreement between TVC and New York Life, which would result from TVC’s failure to take up the loan.”
In the case sub judice, Chrysler sustained its loss as a result of the Bank’s dishonor of its drafts. From the evidence, it is fair to conclude that Chrysler would not have sold the chassis to REC on credit had it not had the Bank’s letter of credit. The letter of credit from the Bank was as good as cash to Chrysler.
To the extent that it reasonably could, Chrysler stopped in transit the 10 chassis, which had not yet been altered by REC, and diverted them to other purchasers, thus minimizing the Bank’s liability under its letter of credit. It had no obligation to the Bank, however, to use methods which could have resulted in its becoming involved in a lawsuit to recover the vehicles which were in REC’s possession, and title to which had been transferred to REC with the Bank’s approval. It had no obligation to the Bank to recover the chassis in various stages of construction as recreational vehicles and then attempt to sell them in such state on a deflated market. Chrysler’s letter of credit from the Bank was as good as cash, and Chrysler had the right to rely upon it.
REVERSED and remanded with directions to enter final judgment in favor of Chrysler in the amount of $269,910.57, with interest thereon from December 19, 1974.
ERVIN and LARRY G. SMITH, JJ., concur.