245 F.3d 82 (2nd Cir. 2001)
 HAMILTON BANK, N.A., Plaintiff-Counter-Defendant-Appellant,
v.
KOOKMIN BANK (formerly The Citizen National Bank), Defendant-Cross-Claimant-Counter-Claimant-Appellee, SKY INDUSTRIES CORPORATION, Defendant-Cross-Defendant.
 No. 99-7595
 UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
 March 15, 2001
 
 1
 [Copyrighted Material Omitted][Copyrighted Material Omitted]
 
 
 2
 KEVIN C. LOGUE (Paul, Hastings, Janofsky & Walker LLP, William C. Rand, on the brief), New York, NY for Plaintiff-Counter-Defendant-Appellant.
 
 
 3
 ELLIOT SILVERMAN (McDermott, Will & Emery), New York, NY for Defendant-Cross-Claimant-Counterclaimant-Appellee.
 
 
 4
 Before: KEARSE and POOLER, Circuit Judges, and KORMAN, District Judge.*
 
 POOLER, Circuit Judge
 
 5
 Plaintiff Hamilton Bank, N.A. ("Hamilton") issued a $ 1.5 million letter of credit on behalf of Sky Industries Corporation ("Sky") for the benefit of Sung-Jin Trading Co. ("SungJin"). The letter of credit contained several conditions including a requirement that the entity negotiating it provide an authenticated telex from Hamilton. Sung-Jin, a Korean company, negotiated the letter of credit to Kookmin Bank ("Kookmin"), a Korean financial institution, without the required telex and with certain other documents that may have been altered or forged. When Kookmin presented the letter of credit to Hamilton for payment, Hamilton refused, claiming that the documents presented did not meet the requirements of the letter of credit but failing to specify the particular deficiencies. Hamilton later issued a second but untimely disclaimer specifying the missing telex--and other deficiencies no longer at issue--as the reasons for its refusal to pay. Hamilton argues that Kookmin's negligence and/or its fraudulent collusion with Sung-Jin in initially accepting the documents precludes Kookmin from relying on the untimeliness of Hamilton's disclaimer. Hamilton also contends that Kookmin defamed Hamilton in a letter Kookmin sent to the Office of the Comptroller of the Currency ("OCC").
 
 BACKGROUND
 Hamilton Issues the Letter of Credit
 
 6
 Alex Halberstein, who acts as a broker for international companies seeking letters of credit, had a long standing relationship with Moises Cikurel, the owner of Sky Industries. Sky sought and Halberstein obtained letters of credit that neither the issuing financial institution nor Sky intended would be negotiated. Instead, Sky used the letters of credit to demonstrate that there was a business relationship between it and various Asian companies to which Sky sought to send exports. Through Halberstein's efforts, Sky eventually obtained a line of credit from Hamilton. The contract between Sky and Hamilton provided that each letter of credit Hamilton issued would require that, in order to obtain payment, the beneficiary must provide a tested or authenticated telex from Hamilton and that Hamilton would not send the required telex unless Sky previously had deposited the full value of the letter of credit with Hamilton. Thus, Hamilton believed itself to be protected against negligent or fraudulent negotiation of a letter of credit.
 
 
 7
 On June 11, 1996, Hamilton issued a $ 1.5 million letter of credit on behalf of Sky and for the benefit of Sung-Jin in connection with Sky's planned purchase of leather sport shoes from Sung-Jin. The letter provided that drafts could be negotiated "at 180 days after transport document date" upon presentation of the letter along with a bill of lading, an original and three copies of a commercial invoice and packing list, and a "copy of authenticated (sic) telex from issuing bank to advising bank, indicating quantity to be shipped, destination, and nominating transporting company." The letter also specified that it was issued pursuant to the Uniform Customs and Practice for Documentary Credits ("UCP") (1993 revision) ICC Pub. No. 500. Hamilton amended the letter of credit three times. The only change relevant to this litigation was made in the third amendment and provided
 
 
 8
 no further amendments of this 1/c will be issued by applicant, any other condition should be in accordance with 'option contract', signed by applicant and beneficiary dated May 31, 1986. ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED. SUBJECT TO UCP 500.
 
 Kookmin Negotiates the Letter of Credit
 
 9
 In June 1996, Sung-Jin's principal, Jin Kon Kim attempted to negotiate the letter of credit to Kookmin. Taek Su Jun, an employee of Kookmin, repeatedly told Kim that Kookmin would not accept the letter of credit without an authenticated telex, and Kim responded that he would take care of this problem. However, on July 13, 1996, Kim returned to Kookmin and again presented the amended letter of credit along with a purported option contract between Sky and Sung-Jin and special instructions allegedly signed by Sky but without the authenticated telex. The option contract contained two relevant provisions:
 
 
 10
 4) IT IS . . . CLEARLY UNDERSTOOD THAT THE ESTABLISHMENT OF THE DOCUMENTARY CREDIT IN FAVOUR OF THE EXPORTER BY THE APPLICANT DOES NOT CONSTITUTE IN ANY WAY A PURCHASE OF THE GOODS BY THE APPLICANT FROM THE EXPORTER, UNLESS THE APPLICANT EXECUTES THE OPTION AND CONFIRMS HIS DEFINITE PURCHASE, WHICH WOULD BE THROUGH THE ISSUING BANK'S TESTED TELEX. THE APPLICANT AND EXPORTER BOTH ACKNOWLEDGE THAT ISSUING BANK WILL NOT ISSUE SUCH TELEX, UNLESS FUNDS COVERING 100% OF THE VALUE OF THE LETTER OF CREDIT ARE DEPOSITED IN THE BANK, FULLY PLEDGED TO GUARANTEE SAME.
 
 
 11
 5) ACTUAL PURCHASING QUANTITY IS SUBJECT TO INCREASE OR DECREASE LESS THAN 10% THE DETAILS SUCH AS FINAL PURCHASING QUANTITY, DESTINATION, SHIPPING COMPANY AND SO FORTH WILL BE INSTRUCTED THROUGH LETTER OF CREDIT OR SPECIAL INSTRUCTIONS BY SKY INDUSTRIES CORPORATION.
 
 
 12
 The special instructions allowed Sung-Jin to choose the transportation company and provided that the shoes must be shipped to New York. In addition, Kim gave Jun a bill of lading representing that 40,000 pairs of sport shoes had been loaded on board the Hanjin Savannah on July 12, 1996.
 
 
 13
 Jun testified that Kim persuaded him that the option contract--with its reference to special instructions--eliminated the authenticated telex requirement. Although Jun never had heard of Sung-Jin prior to that company's attempts to negotiate the letter of credit, he accepted it. Jun first asked for security but later decided to rely on insurance through the Korean Export Insurance Authority. On the day he negotiated the letter, Jun contacted Hamilton's advising bank in Korea, Dongnam Bank, to determine whether the letter of credit and amendments were authentic but did not ask whether the option contract and special instructions replaced the authenticated telex as a basis for negotiating the letter.
 
 Hamilton's Rejection
 
 14
 On July 22, 1996, Kookmin presented the letter of credit, draft, and shipping documents to Hamilton in order to obtain payment. Hamilton returned the documents to Kookmin via DHL courier on July 24, 1996, along with a letter stating that Hamilton would not honor the letter because presentment was "not in compliance with the terms and conditions of the credit." Kookmin received the documents on July 27, 1996, and presented them again on August 2, 1996. On August 6, 1996, Hamilton rejected the presentation a second time. On that date, Kookmin also received a "SWIFT," which we assume to be a telecommunication, from Hamilton explaining that Hamilton rejected the presentation because it lacked an authenticated telex.
 
 
 15
 Kookmnin Attempts to Recoup its Loss From Sources Other than Hamilton
 
 
 16
 Jun testified to several attempts he made to recoup Kookmin's loss from Sung-Jin. First, he unsuccessfully attempted to call Kim several times. In August 1996, Jun went to Sung-Jin's office and found it empty and unlocked. After this visit, Jun sent Kim a message to call him, and the two had two or three subsequent telephone conversations, all of which were initiated by Kim. Jun testified he requested a meeting with Kim. Although Jun asked Kim to come to his office, Kim refused. Jun and Kim subsequently had a Sunday meeting in a schoolhouse where Kim gave Jun approximately $ 31,319. Jun returned this money to Kookmin the next day. Jun also claimed that he sent a letter demanding repayment to Kim at his home address.
 
 
 17
 In March of 1997, Kookmin's insurance carrier disclaimed coverage based on Kookmin's "serious negligence" in accepting the letter of credit. Fifteen months later, Kookmin disciplined Jun for his failure to follow appropriate procedures.
 
 
 18
 No-one ever retrieved the goods covered by the letter of credit, and ultimately, U.S. customs officials sold them at a public auction which realized $ 25,000.
 
 The Allegedly Libelous Letter
 
 19
 Kookmin also continued to pursue its claim against Hamilton. On October 14, 1997--after negotiations and demands failed--Kookmin faxed a letter to the United States Comptroller of the Currency with copies to several OCC officials. Kookmin complained that Hamilton refused to honor its irrevocable letter of credit, claimed to have evidence that Hamilton had issued "similar documents with same results," and stated, "We believe Hamilton . . . has committed fraud.[1] In response, OCC first contacted Hamilton, which explained that the documents Kookmin proffered did not conform to the letter of credit, and then asked Kookmin if it had any specific evidence that Hamilton had issued similar documents in the past or that it had committed fraud. Kookmin sent the Comptroller documentation related to the transaction at issue in this lawsuit and explained that Hamilton, in contravention of the UCP, failed to specify the deficiencies in Kookmin's presentation and used mail rather than telex and thus caused Kookmin to lose its opportunity to retrieve its money from Sung-Jin. Kookmin also submitted a similar letter of credit issued by Hamilton to Ssangyong Bank and stated its belief that "Hamilton . . . has issued many similar documents. Although we, Kookmin Bank, are aware of only two (Ssangyong's and ours)."
 
 The Korean Action
 
 20
 In December 1997, Kookmin filed a lawsuit in Korea to recover damages for Hamilton's refusal to honor its letter of credit.
 
 The District Court Action
 
 21
 On March 25, 1998, Hamilton sued Kookmin in the United States District Court for the Southern District of New York. Hamilton sought an order enjoining the Korean lawsuit, a judgment declaring that it was not liable on the letter of credit, damages for libel, an award of lost profits, and punitive damages. Hamilton also named Sky as a defendant, requesting indemnification in the event that it had to pay Kookmin. Kookmin counterclaimed for breach of the letter of credit. After the district court (Kaplan, J.) denied Hamilton's request for injunctive relief, the Korean court ruled in Kookmin's favor. See Hamilton Bank, N.A. v. Kookmin Bank, 44 F. Supp. 2d 653, 657 (S.D.N.Y. 1999). In November 1998, Kookmin moved for summary judgment, arguing principally that (1) because Hamilton failed to make a timely and specific disclaimer, Article 14 of the UCP precluded it from disclaiming and (2) the letter to the comptroller was a privileged statement of opinion. In response, Hamilton argued that Kookmin itself violated the duty of due care imposed on it by Article 13 of the UCP; Kookmin may have accepted the letter of credit with culpable knowledge, thus vitiating its status as a holder in due course; Kookmin failed to mitigate its damages; and Kookmin's malice destroyed any privilege it might have enjoyed.
 
 
 22
 The district court ruled in Kookmin's favor on both the letter of credit and libel claims. In pertinent part, the court found that (1) Hamilton's disclaimer was untimely and insufficiently specific; (2) any fraudulent documentation alleged by Hamilton was immaterial because it did not gull Hamilton into accepting the obviously insufficient documentation; (3) fraud in the transaction was not available to Hamilton as a defense because the bank alleged documentary fraud rather than the complete worthlessness of the goods shipped; (4) Kookmin's failure to comply with Article 13 of the UCP did not excuse Hamilton's failure to make a timely and specific disclaimer; (5) Hamilton's mitigation of damages defense lacked merit; and (6) Kookmin's letter to OCC enjoyed a qualified privilege that it did not abuse. See Hamilton, 44 F. Supp. 2d at 658-66. Subsequently, the court entered a judgment submitted by Hamilton and dismissed without prejudice all claims against Sky.
 
 
 23
 This appeal followed.
 
 DISCUSSION
 I. Standard of Review
 
 24
 We review de novo the district court's grant of summary judgment. See, e.g., Weinstock v. Columbia Univ., 224 F.3d 33, 40 (2d Cir. 2000). We will not sustain a district court's grant of summary judgment unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Weinstock, 224 F.3d at 41 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)).
 
 II. The Letter of Credit
 A. Choice of Law
 
 25
 The district court determined that Florida law governed the parties' dispute over the letter of credit. See Hamilton, 44 F. Supp. 2d at 658. Neither party questions this conclusion on appeal, and we accept it. See N.Y.U.C.C. 4-102(2) (law of issuing bank's locus governs liability for nonpayment on a letter of credit). In addition, Hamilton specified that its letter of credit would be governed by the UCP (1993 revision) ICC Publication No. 500. Therefore, the parties' claims also are subject to the International Chamber of Commerce Uniform Customs and Practice for Documentary Credits, 1993 revision. See Harris Corp. v. National Iranian Radio and Television, 691 F.2d 1344, 1354 (11th Cir. 1982) (applying Florida law).
 
 B. The Merits
 
 26
 Article 14 of the UCP allows an issuing bank to refuse to pay on a letter of credit if it "determines that the documents appear on their face not to be in compliance with the terms and conditions of the Credit." UCP Art. 14(c). However, the issuing bank "must give notice [of its refusal] by telecommunication or, if that is not possible, by other expeditious means, without delay but no later than the close of the seventh banking day following the day of receipt of the documents," and its "notice must state all discrepancies in respect of which the bank refuses the documents." UCP Art. 14(d)(i),(ii). Failure to comply with Article 14's notice provisions, "precludes the issuing bank] from claiming that the documents are not in compliance with the terms and conditions of the Credit." UCP Art. 14(e); see also Kerr-McGee Chem. Corp. v. FDIC, 872 F.2d 971, 973 (11th Cir. 1989) (precluding bank from relying on ground for disclaimer not specified in its initial dishonor pursuant to Florida law).
 
 
 27
 Hamilton did not comply with Article 14 in two respects: its first and only timely disclaimer was not sent by telecommunication and did not specify the grounds for disclaimer. Nevertheless, the bank seeks to avoid preclusion by arguing that (1) fraud tainted both the underlying transaction and the documents presented to Hamilton and (2) Kookmin knowingly forwarded non-conforming documents in violation of Article 13 of the UCP.
 
 1. Fraud
 
 28
 Hamilton bases its fraud defense on evidence that the option contract and special instructions proffered to Kookmin were fakes and differed in substantive ways from the signed originals. Most significantly, the copy of the option contract Kim gave to Kookmin, but not the alleged original, contained a reference to "special instructions" upon which Kookmin allegedly relied in disregarding the absence of an authenticated telex. However, the option contract also referred to the need for an authenticated telex, and the special instructions did not address that requirement at all.[2]
 
 
 29
 As it must, Hamilton concedes that the UCP does not explicitly provide for belated dishonor based on fraud but claims that a Florida Uniform Commercial Code provision permitted it to refuse to negotiate the letter of credit after the UCP Art. 14(d)(i) period expired. At the time the letter of credit was negotiated, Section 675.114 of the Florida Statutes Annotated provided:
 
 
 30
 (2) Unless otherwise agreed when documents appear on their face to comply with the terms of a credit but a required document does not in fact conform to the warranties made on negotiation or transfer of a document of title ( 677.507) or of a certificated security ( 678.1081) or is forged or fraudulent or there is fraud in the transaction: (a) The issuer must honor the draft or demand for payment if honor is demanded by a negotiating bank or other holder of the draft or demand which has taken the draft or demand under the credit and under circumstances which would make it a holder in due course ( 677.3021) .
 
 
 31
 Fla. Stat. Ann. 675.114 (West 1998). Moreover, an Eleventh Circuit case involving a Florida Bank confirms that fraud in the transaction and fraudulent documentation are defenses even in cases governed by the UCP. See Harris, 691 F.2d at 1355 n.19.
 
 
 32
 However, Section 675.114 and Harris leave open two important questions. First, former section 675.114 does not address the time period in which an issuing bank must make an objection based on forged or fraudulent documents. Must these objections, too, be made within seven business days? Second, Hamilton's letter of credit did not demand that the negotiating bank furnish either the special instructions or the option contract to Hamilton. Under these circumstances, can Hamilton refuse to pay because those documents are false or fraudulent?
 
 
 33
 Based on a comparison of the language of the UCP with Section 675.114(2) and examination of relevant cases, we believe that an issuing bank can disclaim based on latent fraud more than seven days after receipt of a negotiating bank's presentation. Article 14 indicates that it applies only to "documents [that] appear on their face" not to conform with the letter of credit. UCP Art. 14(c). On the other hand, Section 675.114(2) applies only where a defect in the documentation cannot be discerned from the face of the document itself. See Fla. Stat. Ann. 675.114(2) (indicating that fraud exception applies "when documents appear on their face to comply with the terms of a credit" but documents are fraudulent or there is fraud in the transaction). Thus, according a defrauded bank more than seven days to reject a fraudulent presentation would not undermine the purposes of Article 14(e) of the UCP because latent fraud is not covered by Article 14. Case law that would assist in assessing the interplay between UCP Art. 14(d)'s seven-day limitations period for disclaiming based on defects in documentation required by a letter of credit and Section 675.114(2) is sparse. However, the cases that exist support allowing an issuing bank to disclaim based on latent but not patent fraud in documents or in the transaction after the Article 14(d)(i) period has passed. See, e.g., Boston Hides & Furs, Ltd. v. Sumitomo Bank, Ltd., 870 F. Supp. 1153, 1162-63 (D. Mass. 1994) (allowing fraudulent document defense despite earlier disclaimer based on different grounds); Semetex Corp. v. UBAF Arab Am. Bank, 853 F. Supp. 759, 772 (S.D.N.Y. 1994) (stating that UCP governs only "facial discrepancies"), aff'd, 51 F.3d 13 (2d Cir. 1995). The Boston Hides court well articulated the policy reason for treating latent frauds differently from frauds evident from the face of the document. It said:
 
 
 34
 Preclusion under Article 16 [Article 14's predecessor] is designed to both balance the beneficiary's obligation of strict compliance under a letter of credit and give the beneficiary prompt notice of defects so it can cure them. It is, in a sense, punishment for an issuer's failure to timely meet its obligations under the letter of credit. Where a beneficiary submits false documents, however, the defect is latent, not apparent from the face of the material presented. To preclude the [issuing banks] for failure to assert such an intentional "discrepancy" which they could not have discovered "without delay" would improperly punish them for [the beneficiary's] wrongful conduct and not for their own error.
 
 
 35
 See Boston Hides, 870 F. Supp. at 1163. We find this distinction to be persuasive and believe that the Florida courts would also find that an issuing bank can disclaim based on latent fraud after the Article 14(d)(i) period has expired as long as the negotiating bank is not a holder in due course.
 
 
 36
 However, Section 675.114 applies only to documents required by a letter of credit. The letter of credit here did not require that the negotiating bank furnish either an option contract or special instructions. Therefore, fraud in these two documents did not entitle Hamilton to disclaim pursuant to Section 675.114. The documents are also immaterial. Because the documents, on their face, do not eliminate the authenticated telex requirement and Hamilton, which dictated the terms of the letter of credit, could not have been fooled into thinking that they did, Hamilton cannot disclaim based on fraud. If the forged option contract or special instructions had purported to eliminate any requirement under the letter of credit, arguably they would have been material, but in the absence of any connection to the requirements of the letter of credit, they cannot justify Hamilton's disclaimer.
 
 
 37
 The letter of credit did require a bill of lading. However, as noted at 7830 n.2, Hamilton did not argue below that false statements in the bill of lading permitted it to refuse payment. Therefore, we will not consider the impact of the allegedly false statements in the bill of lading. See, e.g., Baldwin, 223 F.3d at 102.
 
 
 38
 2. Knowing Submission of Non-Conforming Documents
 
 
 39
 In addition to arguing that Kookmin was complicit in Sung-Jin's submission of fraudulent documents, Hamilton also argues that, at a minimum, there is an issue of fact as to whether Kookmin negligently or knowingly forwarded non-complying documents by submitting the letter of credit without the required authenticated telex. We agree that a reasonable juror could find that Kookmin knew or should have known an authenticated telex was required, but we find that this issue of fact is not material.
 
 
 40
 Hamilton relies on Article 13(a) of the UCP, which states that "banks must examine all documents stipulated in the Credit with reasonable care, to ascertain whether or not they appear on their face, to be in compliance with the terms and conditions of the credit." Hamilton contends that Kookmin's failure to comply with Article 13(a) prevents it from relying on Article 14. This argument largely relies on the Fifth Circuit's decision in Philadelphia Gear Corp. v. CentralBank, 717 F.2d 230 (5th Cir. 1983). Over a strong dissent, the Philadelphia Gear majority interpreted an earlier version of the UCP and found that a negotiating bank that knowingly presents non-conforming documents in connection with a letter of credit cannot rely on the UCP's preclusion principle. See id. at 238. However, a Florida federal court sitting in diversity rejected the Philadelphia Gear approach. See Ban que de L'Union Haitienne, S.A. v. Manufacturers Hanover Int'l Banking Corp., 787 F. Supp. 1416, 1420, 1422-24 (S.D. Fla. 1991) (rejecting issuing bank's argument that negotiating bank could not rely on preclusive effect of Article 16, a predecessor of Article 14, because it failed to meet its duty under Article 15, a predecessor of Article 13, by failing to use reasonable care in examining the documents), aff'd, 959 F.2d 971 (11th Cir. 1992); see also Banco do Brasil v. City Nat'l Bank of Miami, 609 So. 2d 689, 691 (Fla. Dist. Ct. App. 1992) (rejecting Philadelphia Gear majority's approach and stating that "the Philadelphia Gear dissent represents the better reasoned and more widely accepted view"), review denied, 617 So. 2d 318 (Fla. 1993). In addition, both the Eleventh Circuit and an intermediate level Florida appellate court have ruled that the preclusive provisions of predecessors to Article 14 must be strictly construed against an issuing bank that fails to make a prompt or specific disclaimer. See Kerr-McGee, 872 F.2d at 973-74[3] Banco do Brasil, 609 So. 2d at 691. Although Florida's highest court has not squarely confronted this issue, we see no reason to reject the prevailing view of the Florida courts. Nothing in Article 14 requires that the negotiating bank comply with Article 13 in order to rely on Article 14's preclusion provision, and the preclusion language is mandatory and admits of no exception.[4]
 
 3. Damages
 
 41
 Hamilton also argues that Kookmin cannot recover the full amount due under the letter of credit because it failed to mitigate its damages and because it retained a commission of $ 50,421 and received an additional $ 31,319 from Sung-Jin.
 
 
 42
 Hamilton's mitigation argument rests on Kookmin's failure to seize and sell the shoes referred to in the letter of credit or to notify Hamilton that the U.S. Customs Service intended to sell them as well as its less than vigorous attempts to pursue recovery from Sung-Jin. Preliminarily, Kookmin responds that Hamilton waived this defense by failing to assert it in response to Kookmin's counterclaim. We disagree. The pretrial order deemed the pleadings amended to include an assertion that Kookmin should have mitigated its damages. In addition, the district court considered the mitigation defense on the merits. See Hamilton, 44 F. Supp. 2d at 664. However, Kookmin correctly argues that it had no duty to mitigate its damages. See Chrysler Motors Corp. v. Florida Nat'l Bank at Gainesville, 382 So. 2d 32, 38 (Fla. Dist. Ct. App. 1979) (holding that in light of the "sanctity . . . attached to a letter of credit," beneficiary had no duty to issuing bank to mitigate damages by self-help repossession even though contract between beneficiary and its vendee authorized this remedy). We also note that representatives of the shippers who held the shoes testified that they would not have released the goods to Kookmin without an original bill of lading endorsed by Hamilton, and Hamilton conceded that it made no efforts to exercise its own rights under the bill of lading.
 
 
 43
 Hamilton argued to the district court in a footnote only that Kookmin's judgment should be reduced by the commission it charged Sung Jin and the additional money it recovered. Given the scanty attention Hamilton paid to this issue, the district court understandably did not address it. We believe it appropriate that the district court consider this issue in the first instance and therefore vacate the judgment insofar as it sets the amount of damages and remand so that the court can consider the parties' arguments concerning Kookmin's commission and Sung-Jin's payment.
 
 4. Interest
 
 44
 Hamilton contends that the district court erred by running the pre-judgment interest on Kookmin's recovery from July 22, 1996. The American bank reasons that because the letter of credit says it is "available to the beneficiary by their draft(s) at 180 days after transport document date," July 12, 1996, the interest could not have started running before January 12, 1997. Kookmin responds that Hamilton waived this argument by failing to present it to the district court and by furnishing a proposed judgment that incorporated the allegedly incorrect interest calculation. According to Hamilton, there was no waiver because it had no reason to anticipate that the district court would run the interest from the day of Kookmin's demand. See Hamilton's Reply Brief at 21-22 (relying on Chase Manhattan Bank v. American Nat'l Bank, 93 F.3d 1064 (2d Cir. 1996)). However, Hamilton's argument contradicts the record. Kookmin clearly asked the district court for interest "from the date of demand." Def.'s Mem. Supp. Summ. J. at 21 (citing Fla Stat. Ann. 675.115(1)). In Chase Manhattan, we allowed the plaintiff to argue that the district court selected the wrong date for the beginning of the damages period because the plaintiff "raise[d] that argument [on appeal] by way of a challenge to an aspect of the district court's analysis that [the plaintiff] need not have anticipated." Id. at 1072. Because Hamilton knew both that the district court would award interest if Kookmin prevailed and that Kookmin had requested interest from the date of its demand, Chase Manhattan is inapposite. Hamilton's failure to raise this issue before the district court is particularly salient because the letter of credit does not unambiguously support Hamilton's position. It is not clear what the phrase "available to the beneficiary by their draft(s) at 180 days after transport document date" means, particularly in light of the fact that the letter expired on December 4, 1996. If Hamilton's position is correct, then the letter could not be paid before January 12, 1997, or after December 4, 1996, making Hamilton's obligations under the letter of credit truly illusory.
 
 III. Libel
 A. Choice of Law
 
 45
 The district court found that Florida law governed Hamilton's libel claim because Hamilton is a Florida bank. See Hamilton Bank, 44 F. Supp. 2d at 658. Although Hamilton suggests that both Florida and Georgia law are relevant since Kookmin sent its letter into both states, "practical necessity dictates that ordinarily an action for interstate libel be tried under the substantive law of one . . . jurisdiction[]." Zuck v. Interstate Publ'g Corp., 317 F.2d 727. 734 (2d Cir. 1963). The district court correctly chose Florida law because Florida is both Hamilton's location and the place where one copy of the allegedly libelous letter was received. See Lee v. Bankers Trust Co., 166 F.3d 540, 545 (2d Cir. 1999) ("Under New York choice-of-law rules in defamation cases the state of the plaintiff's domicile will usually have the most significant relationship to the case, and its law will therefore govern.") (internal quotation marks omitted).
 
 B. Merits
 
 46
 The district court found that Kookmin had a qualified privilege to communicate its complaint against Hamilton to the OCC and Hamilton failed to offer sufficient evidence of express malice to defeat the privilege. See Hamilton, 44 F. Supp. 2d at 665. Hamilton contends that the court should have submitted the issue of express malice to the jury.
 
 
 47
 Under Florida law, a qualified privilege exists when the defendant communicates "in good faith on any subject matter [in which it has an interest] or . . . a duty . . . to a person having a corresponding interest or duty, even though it contains matter which would otherwise be actionable, and though the duty is not a legal one but only a moral or social obligation." Nodar v. Galbreath, 462 So. 2d 803, 809 (Fla. 1984) (quoting 19 Fla. Jur.2d Defamation and Privacy 58 (1980)). The determination of whether a qualified privilege exists is for the court "where the circumstances surrounding a defamatory communication are undisputed, or are so clear under the evidence as to be unquestionable." Nodar, 462 So. 2d at 810. Both Kookmin's interest in obtaining a remedy for Hamilton's failure to honor the letter of credit and the OCC's duty to regulate Hamilton are uncontroverted. Nonetheless, Hamilton contends that the qualified privilege does not apply because Kookmin communicated its statements to five different OCC representatives-employees in OCC's Florida and Atlanta offices, OCC's chief counsel, its director of international banking and finance, and the comptroller himself. We disagree because all of these individuals shared a common interest in insuring that Hamilton, a regulated bank, properly carried out its business. See id., 462 So. 2d at 809.
 
 
 48
 Because Kookmin conclusively established that its communication was of a type that ordinarily enjoys a qualified privilege, Kookmin is presumed to have acted in good faith. See Demby v. English, 667 So. 2d 350, 353 (Fla. Dist. Ct. App. 1995). To defeat this presumption, Hamilton must submit enough evidence to allow a trier of fact to conclude that Kookmin acted with express malice, which means it was "motivated more by a desire to harm the person defamed than by a purpose to protect the personal or social interest giving rise to the privilege." Nodar, 462 So. 2d at 811. Hamilton cannot establish express malice by showing that Kookmin's statements were false. See Demby, 667 So. 2d at 353. Nor do "strong, angry, or intemperate words . . . alone show express malice." Nodar, 462 So. 2d at 811. We must determine as a matter of law that plaintiff cannot defeat the privilege where "the plaintiff's evidence [is] insufficient as a matter of law to carry the burden of proving express malice." Id. at 812.
 
 
 49
 In its attempt to show that it produced sufficient evidence of express malice to reach the jury, Hamilton again relies on the "wide dissemination" of Kookmin's letter. Hamilton's Br. at 56. Because Kookmin's letter did not go beyond the OCC, a reasonable juror could not draw an inference of malice from the fact that Kookmin sent the letter to five OCC officials rather than one. Hamilton also argues that the jury could infer malice from the failure of the author of the letter, an American trained attorney, to conduct any kind of investigation before making his accusation of fraud. We find that a reasonable juror could not have found that the primary motive for Kookmin's letter was to harm Hamilton. First, Kookmin's year-long attempt to resolve its grievance with Hamilton before contacting the OCC tends to negate any inference of malice. See Nodar, 462 So. 2d at 812. Second, as the district court pointed out, Kookmin's letter is largely couched in terms of opinion. The only "evidence" that Kookmin points to is "evidence that Hamilton . . . issued similar documents with same results." The core of Kookmin's allegation of fraud seems to be that Hamilton issued purportedly irrevocable letters of credit with no intention of honoring them. This claim is not far from the truth. Alex Halberstein testified that he informed Hamilton "that these letters of credit were not intended ever to be paid." In addition, Hamilton's contract with Sky provided that no authenticated telex would be issued unless Sky deposited the full amount of the letter of credit with Hamilton. Although these facts do not add up to fraud, they do suggest that Hamilton believed it would never have to honor the letters of credit. Finally, Kookmin promptly specified its admittedly insufficient basis for concluding that Hamilton had acted fraudulently when the 0CC requested particulars. In light of all these circumstances, we agree with the district court that a reasonable juror could not draw an inference of express malice from Kookmin's ill-advised conclusion that Hamilton's acknowledged practice constituted fraud. The clear primary purpose of Kookmin's letter was to obtain redress for Hamilton's dishonor either from the OCC or from the courts.
 
 CONCLUSION
 
 50
 For the reasons we have discussed, we affirm the judgment of the district court insofar as it determined the liabilities of the parties but vacate and remand for further proceedings consistent with this opinion insofar as the judgment determines the amount of damages.
 
 
 
 Notes:
 
 
 *
 The Honorable Edward R. Korman, now Chief Judge of the United States District Court for the Eastern District of New York, sitting by designation.
 
 
 [1]
 The body of the letter states: We, the Kookmin Bank, providing full banking service, are incorporated in Seoul, Korea. We believe we [have] been defrauded by Hamilton Bank, N.A., Miami, Florida. We request your assistance. Please assist us. June 11, 1996, Hamilton Bank, N.A., Miami Florida, issued irrevocable documentary Credit No. 100033401. The letter of credit states"(sic)
 . . . PLEASE ADVISE BENEFICIARY THAT WE HEREBY ESTABLISH OUR IRREVOCABLE DOCUMENTARY CREDIT NO.100033401 AS FOLLOWS: EXPIRING ON: DECEMBER 4, 1996 IN SOUTH KOREA . . .
 July 13, 1996, we have negotiated the Letter of Credit with Beneficiary. On July 22, we remitted all the required documents to Hamilton Bank, N.A., Miami, Florida. However, they have refused to reimburse our costs. We believe Hamilton Bank, N.A., Miami, Florida, issued such document with intent not to honor irrevocable documentary credit. We have evidence that Hamilton Bank, N.A., Miami, Florida, has issued similar documents with same results. We believe Hamilton Bank, N.A., Miami, Florida has committed fraud. Thus, we are preparing to bring lawsuit in Korea and need your assistance[]. We would like to know the corporate status of Hamilton Bank, N.A., Miami, Florida. We, also, would like to know all the complaints, lawsuits, and sanctions filed against Hamilton Bank, N.A., Miami, Florida. Furthermore, we would appreciate a copy of Hamilton Bank, N.A., Miami, Florida's certificate of incorporation. If you have any question, do not hesitate to contact me.
 
 
 [2]
 Hamilton also contends that the bill of lading falsely stated that the shoes had been shipped on July 12, 1996, while they actually were not shipped until July 18, 1996, and falsely claimed that 40,000 pairs of shoes had been shipped when only 27,000 ultimately were auctioned and argues that it can disclaim based on fraud in the transaction. We need not address that claim because the record below reveals that although Hamilton referred to the discrepancies in the bill of lading in a footnote to its brief, it did not seek relief based on these discrepancies. See Baldwin v. United States Army, 223 F.3d 100, 102 (2d Cir. 2000) (per curiam).
 
 
 [3]
 In Kerr McGee, retired United States Supreme Court Justice Lewis F. Powell, Jr., sitting by designation and writing for the court, acknowledged that prior to the 1983 revision of the UCP, courts took differing views of the estoppel effect of a bank's failure to specify the grounds for disclaimer in a notice of honor. See 872 F.2d at 974. However, because the 1983 revision, like the current version, required that a disclaiming bank state specifically the grounds for its disclaimer and penalized its failure to do so by precluding a later, unspecified claim of discrepancy, the court found that cases, which like Philadelphia Gear, allowed disclaimer on an unspecified ground, were now irrelevant. See id.
 
 
 [4]
 Hamilton argues that we should not rely on Banco do Brasil or similar cases because (1) no bad faith or fraud was alleged in those cases; and (2) Article 13 has been strengthened since those decisions. We view Hamilton's reliance on fraud or bad faith as an attempt to conflate its fraud argument with an Article 13 argument and reject it for the reasons previously noted. Hamilton also argues that Article 13 now imposes a heightened duty because it requires compliance with "international standard banking practice." Whether Hamilton is correct or not, the revised section does nothing to undermine the preclusive effect of Article 14(e) or to condition that effect on the negotiating bank's compliance with Article 13.
 
 
 KEARSE, Circuit Judge, dissenting in part:
 
 51
 I respectfully dissent from so much of the majority's decision as affirms the granting of summary judgment dismissing the claim of plaintiff Hamilton Bank, N.A. ("Hamilton"), for a declaratory judgment that defendant Kookmin Bank ("Kookmin") is not entitled to collect on the letter of credit dishonored by Hamilton. I am not persuaded, on the present record, taken in the light most favorable to Hamilton as the party opposing summary judgment, that that claim may be resolved as a matter of law.
 
 
 52
 I am in agreement with the majority that in initially rejecting the letter of credit, Hamilton failed to comply with the requirement of Uniform Customs and Practice for Documentary Credits ("UCP") that a notice of rejection must promptly "state all discrepancies in respect of which the bank refuses the documents." UCP Art. 14(d)(ii) (1993). Thus, while Kookmin's presentation of documents without the required telex gave Hamilton the right to dishonor the letter of credit for that reason, the failure to specify that reason in timely fashion deprived Hamilton of the right to rely on the missing telex as a basis for dishonor.
 
 
 53
 However, as the majority acknowledges, citing Boston Hides & Furs, Ltd. v. Sumitomo Bank, Ltd., 870 F. Supp. 1153 (D. Mass. 1994) ("Boston Hides"), the UCP's seven-day limitations period for dishonoring a letter of credit based on defects appearing on the face of the presented documents does not apply to the issuing bank's right to recover for a fraud that is latent. I find that case instructive as well with respect to the assertion of latent fraud as a defense against a claim for wrongful dishonor.
 
 
 54
 In Boston Hides, the beneficiary of a letter of credit sued the issuing bank and confirming bank (the "Banks") for wrongful dishonor. The issuing bank, in dishonoring the letter, had given a reason that was specific but, the court ruled, improper. "In defending the suit, however, the Banks uncovered information which suggest[ed that] Boston Hides' presentment included false documents." 870 F. Supp. at 1158. The court noted that the UCP's provision precluding an issuing bank from relying on discrepancies to justify dishonoring a letter of credit unless it notifies the remitting bank of the claimed discrepancies without delay "do[es] not, however, relate to the effect, if any, of delay on the assertion of a forgery or fraud claim or defense," id. at 1162 (internal quotation marks omitted). The court stated that where the UCP is silent or ambiguous, the court looks to the Uniform Commercial Code, so long as it is consistent with the UCP, and that "under Section 5-114(2) of the Uniform Commercial Code, a court of appropriate jurisdiction may enjoin honor or uphold dishonor by an issuing bank where the bank has been advised that documents submitted pursuant to a letter of credit are fraudulent." 870 F. Supp. at 1164. On the theory that "where a beneficiary submits false documents, . . . the defect is latent, not apparent from the face of the material presented," and that "a party who has knowingly submitted false documents to the issuer presents a classic case of a party with unclean hands," the Boston Hides court reasoned that "to preclude the Banks for failure to assert such an intentional 'discrepancy' which they could not have discovered 'without delay' would improperly punish them for [the beneficiary's] wrongful conduct and not for their own error." 870 F. Supp. at 1163 (internal quotation marks omitted). Thus, the court concluded that "although the Banks' dishonor, based on the [cited] discrepancy, was improper, denial of payment is nonetheless justified because of the plaintiff's submission of false documents." Id. at 1167. There being no genuine dispute that a latent fraud had occurred, the court granted summary judgment in favor of the issuing and confirming banks.
 
 
 55
 In Bank of Cochin, Ltd. v. Manufacturers Hanover Trust Co., 808 F.2d 209 (2d Cir. 1986) ("Cochin"), the issuing bank was likewise the victim of a latent fraud. It conveyed the terms and conditions of the letter of credit to a confirming bank; the beneficiary gave the confirming bank fraudulent documents, and the confirming bank paid the beneficiary (who promptly disappeared with the money) and debited the account of the issuing bank. When the issuing bank thereafter received and examined the documents, it found facial discrepancies and quickly asked the confirming bank not to make payment, but it delayed specifying the precise nature of the noncomplying defect for 12-13 days. The issuing bank sued the confirming bank for wrongful honor of the letter of credit. This Court held that the nearly two-week delay precluded the issuing bank's suit to recover the funds from the confirming bank. I note that in Cochin, however, the beneficiary "had perpetrated a fraud on both banks," id. at 211 (emphasis added).
 
 
 56
 In the present case, Hamilton asserts that there was latent fraud, and there is evidence that the documents Kookmin submitted to Hamilton included two that were forgeries. The beneficiary of the letter of credit was Sung-Jin Trading Company, whose principal was Jin Kon Kim (collectively "Kim"). The letter of credit called for, inter alia, an authenticated telex; it also stated that "any other condition should be in accordance with 'option contract', signed by applicant [identified in the option contract as Hamilton's customer] and beneficiary dated may 31, 1996." The documents Kookmin presented to Hamilton included "special instructions" and an option contract on which Hamilton's customer's signature had been forged; the forged contract included a provision that did not appear in the authentic option contract and allowed variations in, inter alia, the quantity and destination of the goods to be delivered. The district court "recognized that there is evidence in the record supporting" Hamilton's claim "that the special instructions and option contract were forgeries." Hamilton Bank, N.A. v. Kookmin Bank, 44 F. Supp. 2d 653, 659 & n. 52 (S.D.N.Y. 1999).
 
 
 57
 From the decisions in Boston Hides and Cochin, it would appear to be material whether Kookmin was complicitous in the fraud. Hamilton, in support of its contention that Kookmin did not act in good faith but rather had unclean hands and thus should not be allowed to recover, adduced evidence that when Kim initially attempted to negotiate the letter of credit, Kookmin rejected that attempt because of the absence of the authenticated telex; that when Kim renewed his attempt to negotiate the letter of credit, still without the telex, but this time with the forged documents, Kookmin contacted Hamilton's advising bank but did not ask whether the new documents made the telex unnecessary; that despite having no prior relationship with Kim, Kookmin negotiated the letter of credit and paid Kim $ 1.5 million (minus its commission) without requiring any security; that Kim and the Kookmin manager in charge of the transaction had at least one clandestine meeting; and that after rejection by Hamilton, Kookmin made no significant attempt to collect from Kim.
 
 
 58
 I view Boston Hides and Cochin, read together, as indicating that where the issuing bank has not properly dishonored the letter of credit, it is entitled to defeat enforcement of the letter on the ground of a latent fraud if the party seeking enforcement of the letter of credit was complicitous, but not if that party was an innocent victim of the fraud. I view Hamilton's evidence as sufficient to present a triable issue as to whether Kookmin was complicitous in the submission of the fraudulent documents. I thus conclude that summary judgment dismissing Hamilton's claim for a judgment declaring that it is not obligated to pay Kookmin on the letter of credit was inappropriate.